# TAB E

CAUSE NO. CC-10-03251-A

JOHN DOE I; JANE DOE I; and JANE DOE II ,
        Plaintiffs,

v.

THE EPISCOPAL SCHOOL OF DALLAS, INC.,
        Defendants.

FILED
2011 APR 26 PM 2: 45
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

IN THE COUNTY COURT AT LAW

NO. 1

OF DALLAS COUNTY, TEXAS

---

## PLAINTIFFS' FIRST AMENDED PETITION

---

Plaintiffs John Doe I, Jane Doe I, and Jane Doe II[1], through fictitious identities to protect the sexual assault victim Jane Doe II, file this First Amended Petition and assert the following allegations and claims against Defendant the Episcopal School of Dallas, Inc. and pray for their damages as follows:

### I.
### PARTIES

1.    Plaintiffs John Doe I ("Father") and Jane Doe I ("Mother"), are a married couple and the biological parents and of Jane Doe II ("Victim"). The Does reside in Dallas County, Texas.

2.    Defendant The Episcopal School of Dallas, Inc. ("ESD") is a corporation with a principle place of business in Dallas County, Texas. ESD has previously appeared in this matter.

---

[1] This suit was originally brought by John Doe I and Jane Doe I as parents and next friends of Jane Doe II, a minor. Subsequent to the filing of this lawsuit, Jane Doe II reached the age of majority. Defendant has specially excepted to Plaintiffs' Petition and specifically requested that Plaintiffs amend to name Jane Doe II in her individual capacity. As Jane Doe II is the real party in interest, under controlling case law, this substitution of her in her individual capacity instead of her represented capacity does not alter the nature of the suit and is permitted as a matter of right.

## II.
## DISCOVERY PLAN

3. Discovery in this matter is being conducted pursuant to Level 3 of TEXAS RULE OF CIVIL PROCEDURE 190.4 pursuant to this Court's order.

## III.
## VENUE AND JURISDICTION

4. Venue has been properly established in Dallas County, Texas. Pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 15.002, venue is proper in Dallas County because all or a part of the cause of action accrued and all of the parties reside in Dallas County, Texas. No party has objected to same. This Court has jurisdiction because the amount in controversy exceeds the minimum jurisdictional amounts of the Court. No party has objected to same.

## IV.
## FACTUAL BACKGROUND

5. This case is about ESD's betrayals of the Doe Family. As a result of ESD holding itself out as an educational institution that cares for and nurtures students while providing a parochial education grounded in Episcopalian principles, Father and Mother placed their young child in ESD's hands when Victim was just in kindergarten. But ESD did not fulfill its obligations to protect and nurture Victim. Under ESD's watch, an ESD-employed teacher engaged in felonious, sexual predatory acts against Victim lasting for over a seven month period, and ESD failed to protect Victim and prevent or stop this egregious crime. Then, after the teacher admitted his improper conduct to ESD officials and resigned, instead of nurturing the Victim

and helping her recover, ESD betrayed her yet again by constructively expelling her from the school for being a victim of the very sexual abuse ESD permitted.

A.    ESD represents to parents of prospective students that it will provide a safe and nurturing Episcopal environment to its students.

6.    Claiming to being founded in 1974 by leaders from the Episcopal community and grounded in the Episcopal educational tradition, ESD holds itself out to the public as being "among the top coeducational college-preparatory institutions in the nation" that for more than 30 years has "nurtured, challenged, and developed more than 1,100 students [per year] enrolled in Beginner (age 3) through Grade 12 programs, encouraging them to discover their full potential spiritually, intellectually, and physically." ESD's founding tenets represent that its goal is to provide a faith-centered environment focused on Episcopalian principles. The Episcopal Diocese promotes ESD as part of the Diocese and one of "our schools"—reaffirming to the public that ESD is part of and can be relied upon as an Episcopal institution.

7.    Father and Mother chose to send Victim to ESD because of the parochial nature of the school and its professed affiliation with Episcopalian principles. Victim's grandfather was himself an ordained Episcopal minister. Also, Father attended Episcopal schools throughout his life and wanted the same kind of nurturing, religious environment for his own children. So when selecting the institution to whom they would entrust the education and safety of their children, Father and Mother chose to enroll their children, including Victim, at ESD and began paying substantial tuition fees so that their children would be exposed to a nurturing, Episcopal educational environment.

8.      In furtherance of its business, ESD employed teachers as its agents in advancement of its

stated goals.  Relevant to this case, J. Nathan Campbell ("Campbell") was employed by ESD as

a history teacher.  ESD allowed Campbell to supervise a Global Awareness program in which

he planned to escort students to foreign countries.  ESD allowed Campbell unlimited use of and

access to the ESD-owned and furnished Global Awareness house located across the street from

ESD.  ESD provided Campbell with unregulated use of ESD-owned automobiles for personal use.

ESD provided an ESD-owned laptop and computer-access on ESD-owned computers and,

beginning in the Fall of 2009, issued an ESD-owned cell phone to Campbell.  ESD gave Campbell

an ESD corporate credit card.  Campbell was married to another ESD employee, though they

have subsequently divorced.

B.      Victim is sexually assaulted without intervention by Defendants.

9.      Beginning in the spring of 2009, when Victim was a sophomore at ESD, Campbell began

his predatory acts as he groomed Victim for the later assault.  Campbell was Victim's 10th grade

World History teacher, and he began making inappropriate comments to Victim, informing her

that she was special, the only attractive student in his classes, and generally beginning to prey

upon the young minor.  Whenever Victim sought assistance from Campbell regarding class

work, Campbell would comment upon the Victim's appearance and comment on her

attractiveness in a flirtatious manner.  Moreover, Campbell made inappropriate comments in

his report cards for Victim–report cards that other ESD-employees were supposed to monitor.

10.     Campbell's inappropriate violations of the student-teacher boundaries were witnessed

first hand by other ESD employees who failed to report the interactions as a result of not being

appropriately trained to recognize and report the signs of teacher misconduct. Based on admissions of ESD employees, inappropriate conduct by Campbell was witnessed well before Campbell escalated any conduct, but neither of the two teachers present reported it to ESD's administration. Thus, ESD failed to appropriately train, monitor, and prevent Campbell from continuing the grooming process despite having the opportunity to prevent the process during its early stages.

11.    In April 2009, Campbell began making increasingly aggressive sexual overtures to Victim. He would call her on his cell phone to talk socially, and he would contact Victim via the ESD email system via the ESD laptop. He would attend Victim's school-sponsored sporting events so that he would have a basis to talk to Victim.

12.    After weeks of contacting Victim, Campbell arranged a meeting one evening in late April 2009. Campbell went to the meeting and had the Victim join him in a school-owned Suburban. During this meeting, Campbell made inappropriate physical contact with Victim, further emotionally preyed upon her, and ultimately kissed her.

13.    On another occasion at school shortly after the meeting, Victim went to Campbell's office at the school to retrieve school work. Victim had just come from practice and was wearing her athletic clothes. Campbell again assaulted the Victim and attempted to feel her vaginal region, though Victim quickly left.

14.    In late April or early May, shortly before finals at the school and during a half day of classes, Campbell had Victim meet him at his home and increased his aggressive behavior. Campbell sexually assaulted Victim by digital vaginal penetration. Campbell emotionally preyed

upon Victim, assuring her that his actions were appropriate and that they would not get in trouble with ESD.

15.    Over the summer break, Campbell continued his assaultive behavior and, against Victim's stated wishes, Campbell engaged in vaginal intercourse with Victim, who was sixteen years old at the time. Campbell emotionally abused Victim and tried to convince her that nothing was inappropriate and that sex was a way for him to show how much he loved her.

16.    From that point forward, throughout the summer and through the fall of 2009 when school began, Campbell pursued a frequent and continuing sexual engagement with Victim. During this period, Campbell would take Victim to hotels for sex and use the ESD credit card to reserve hotel rooms—actions which should have been caught by ESD but for the fact that they failed to appropriately monitor Campbell. Left uncontrolled, Campbell became increasingly hostile and jealous about Victim's social relationships with other students and became violent. Campbell would have Victim meet him at his home in the evening when his wife was away, and he even introduced Victim to his young son. Campbell would further abuse Victim by stating that he wanted to leave his wife because he loved Victim so much, move to wherever Victim went to college, and start a new family with his son and her.

17.    During this period, Campbell would call Victim multiple times a day on his cell phone, send obscene, graphic text messages during school hours from his cell phone, send inappropriate instant messages from his ESD-owned laptop during school hours and afterwards, and send obscene emails during and after school hours from his ESD-owned school computer. Campbell

also used ESD credit cards to reserve hotel rooms to advance his sexual assault of Victim, and ESD knew or should have known about the improper credit card usage.

18.      Throughout this entire course of Campbell's assaultive behavior, Campbell utilized ESD-owned property in furtherance of his sexual predation.  Campbell freely used ESD-owned automobiles, cell phones, credit cards, and computers to meet and contact Victim.  In fact, Campbell's school-owned laptop reflects thousands of messages or attempted messages sent between Campbell's laptop and Victim during the seven-month period during which Campbell assaulted Victim. Campbell would meet and engage in inappropriate behavior with Victim on school property and in his office, during and after school hours.

19.      Despite all of these actions involving or taking place on school property, ESD was not supervising, monitoring or otherwise enforcing any rules regarding Campbell's behavior as a teacher or usage of school property.  Or, to the extent they were supervising Campbell's behavior, they failed to reasonably act to stop Campbell's actions. Regardless, it was evident that Campbell knew he was not being monitored because his actions show a complete lack of concern that ESD would in any way monitor or punish his misuse. There was no attempt at all to actively monitor how teachers used school property and not even a review of his credit card bills to ensure compliance with school regulations.  Campbell was unrestrained to use ESD property however he chose, including in furtherance of the sexual assault of ESD students, without any fear of being caught because of ESD's non-existent policies and enforcement.

20.      Additionally, ESD either did not have policies and procedures in place to prevent such inappropriate interaction between teachers and students or failed to enforce those policies.  Had

ESD been supervising, monitoring, or enforcing its policies, if any, ESD should have recognized the inappropriate activity and intervened to stop it. Any reasonable employer would have recognized the amount and the substantively inappropriate nature of the communications made by an employee with the employer's property and would have had the appropriate programs in place to monitor how its employees use the equipment. Any reasonable employer would have investigated or prevented an employees' inappropriate contact with someone in the care of the employee. That the employee in question is a teacher and the communications are with a minor student only makes it more unconscionable that ESD failed to monitor or supervise its employee sufficiently. But ESD did not appropriately supervise Campbell, and as a result, the assaults occurred and were on-going. ESD failed to protect Victim and provide the safe and nurturing environment it represented it would provide—and accepted money from Victim's parents to provide.

C.      The Second Assault and Betrayal by Defendants.

21.     On November 29, 2009, Campbell requested that Victim meet him in an abandoned parking lot in North Dallas. Campbell informed Victim that he had fought with his wife and fellow ESD employee over her accusation that he was having an affair. Campbell informed Victim that he planned to leave his wife.

22.     As a matter of chance, police officers interrupted this meeting. After asking for identification and realizing the circumstances, the police told Victim to go home and tell her parents what happened. On her way home, Campbell called Victim to try to fabricate a uniform "story" to tell everyone: that they had met because Victim wanted to talk to someone about

some issues she was working through. Victim went home and told her parents about the police and the fabricated "story."

23. The following day, Campbell met with Rebecca Royall, the Assistant Head of the School to give her the "story" about what occurred. Royall indicated that she was already aware from the police about the incident and was waiting to talk to the Headmaster, Stephen Swann.

24. Royall and Erin Mayo, the Head of the Upper School and Victim's English teacher, met with Campbell and then requested a meeting with Victim and Mother and Father. Victim told Royall and Mayo the "story," and the meeting was ended.

25. On December 1, 2009, Campbell resigned from ESD after admitting he had an inappropriate relationship with a student. Thus, Campbell was permitted to resign without having ESD take any adverse action against him. Campbell was permitted to finish his day teaching classes, clean out his office, collect his things and leave.

26. On December 2, 2009, Royall and Mayo requested another meeting with Victim and Mother and Father. At this meeting, Victim explained the inappropriate contact and relationship, as well as some of the details of Campbell's involvement with Victim. Victim was scared of how the truth would effect her status at the school. Royall and Mayo both assured Victim that she would not be in trouble because she was not to blame; the blame was all on Campbell. Mayo and Royall represented that Victim's well-being was their top priority. They assured Victim that they were there to support her and that Victim could talk to them at any time. They assured Victim that they would maintain her privacy and protect her, but they did say that they needed to contact Child Protective Services. Royall and Mayo also recommended

that Victim see a therapist. That afternoon, Victim and Mother did contact a therapist and,
Victim started attending regular therapy sessions two days later.

27.      In mid-December, 2009, Campbell's wife took a short leave of absence from ESD and
filed for divorce. In early January, 2010, Campbell's wife returned to work at ESD. At this
point, rumors began to spread about Campbell. There were names of other female students in
addition to Victim's name that were attached to the rumors. Following the resignation of
Campbell, ESD failed to appropriately deal with the situation. ESD instead attempted to sweep
the entire matter under the rug. ESD should have addressed the matter with the teachers,
students and families in the ESD community and used this incident as a teaching moment to
establish a safe and healthy environment for Victim and others, as well as train teachers,
students, and families how to handle the situation appropriately, as well as to avoid similar
situations in the future. The failure to appropriately address the matter in an attempt to sweep
it under the rug created an information vacuum that ended up breeding a toxic environment of
gossiping and failed to appropriately establish a framework to protect Victim.

28.      Over the next month, Victim continued to regularly see a therapist and started the long
road to recovery from the trauma she had endured. Mother was in contact with Erin Mayo at
the school to discuss Victim's progress and what could be done for Victim. ESD was aware that
Victim was seeing the therapist. Victim was continuing to attend classes, play sports, and spend
time with school friends, and such routine was assisting Victim in her recovery.

29.      Unexpectedly, on Friday, January 27, 2010, Rebecca Royall and Erin Mayo requested
that Father come to ESD to get an "update" on the situation. Father asked if Mother should

attend the meeting, but he was informed that Mother's presence was unnecessary because it was "just an update."

30.    After Father arrived, he soon learned that the meeting was not called to update the situation. Rather, Royall and Mayo informed Father that ESD and Headmaster Swann had decided that Victim must leave the school. Father was told false statements, that were known to be false by Royall and Mayo, to induce him to withdraw his daughter. Father was told that everyone at the school knew about what happened to Victim. Father was presented with a document and was told that the document was to voluntarily withdraw Victim from ESD. Father was told that if he did not sign the document before leaving the meeting, ESD would immediately expel Victim and that the expulsion would be marked on Victim's permanent record. Father was also told that if ESD had to institute expulsion proceedings, that Victim would not be able to secure college recommendations. These representations were false and ESD's corporate officers have admitted that they were not true statements. Nevertheless, under pressure, Father was forced to rely upon their statements in making his decision.

31.    Father was faced with a dilemma: either way Victim was being forced to leave the school, but the only question was whether it would be a withdrawal or the black-mark of expulsion. Based on the coercive effect of the fraudulent threat of expulsion, Father signed the withdrawal papers under duress. Victim was allowed to finish the school day having no knowledge that this would be her last day attending the school she had attended since kindergarten. Father had been told that Victim would not be permitted to return to school on Monday to even retrieve her possessions from her locker. ESD stated that they would package Victim's possessions and

send them to Victim; however, Victim's possessions were not sent until several months later after Victim's counsel contacted ESD requesting that her personal possessions be returned.

32. The constructive expulsion was done only for ESD's benefit and convenience and was likely done in hopes of covering up the sexual assault ESD permitted. However, the egregious conduct by ESD had a devastating effect upon Victim. While she was undergoing counseling to deal with the original violation, Victim was again betrayed by the school she had trusted and was ruthlessly cast out as undesirable from the place that constituted the universe of Victim's educational, social, and religious support network, thereby depriving Victim of the essential support structures that are needed by victims who are dealing with the trauma of sexual assault. This action of constructive expulsion exhibited negative judgment by ESD and sent the message to the Victim that while Campbell could freely resign, she was being kicked out. Given Victim's psychological state at the time, the conclusion Victim drew was that she was being punished and blamed for the sexual abuse which was inflicted on her. This "victim-blaming" mentality exhibited by ESD in forcing Victim out of school re-victimized the victim of sexual abuse and caused additional significant psychological trauma.

33. ESD's actions did more than psychological damage: in publicly forcing Victim to leave the school, Victim's reputation was severely damaged among her peers. Teachers, students, and parents were able to conclude the connection between Victim's leaving and Campbell's departure thereby exposing Victim to significant embarrassment, shame, trauma and isolation. Given Victim's hastened departure, the impression was given that Victim was somehow to blame, at fault, or complicit in the event, which further damaged the Victim's reputation by

presenting her as at fault or deserving of being forced out. Moreover, Victim's collegiate prospects were threatened, as she was forced to withdraw from school and leave the athletic team that had opened doors to scholarships for her to various colleges. Thus, Victim's emotional trauma was compounded as her social and educational prospects were knowingly or recklessly sacrificed by ESD for ESD's own benefit.

## V.
## CAUSES OF ACTION AND CLAIMS FOR RELIEF

A.    Count One: Assault.

34.    Plaintiffs incorporate the above paragraphs by reference.

35.    Defendant ESD was responsible for the assault, battery, and sexual assault, as those terms are defined by law, of Victim by Campbell who at all times was Defendant's agent, ostensible agent, servant, employee and or representative, including the following acts:

> a.    intentionally, knowingly, or recklessly causing bodily injury to Victim under TEXAS PENAL CODE § 22.01(a)(1);
>
> b.    intentionally or knowingly causing offensive or provocative physical contact with Victim under TEXAS PENAL CODE § 22.01(a)(3); and
>
> c.    intentionally or knowingly causing penetration of the female sexual organ of Victim, a child, by any means under TEXAS PENAL CODE § 22.011(a)(2)(A).

36.    Theses acts were a proximate cause of damage to Plaintiffs.

B.    Count Two: Negligence.

37.    Plaintiffs incorporate the above paragraphs by reference.

38.    At all times relevant hereto, Defendant owed a duty to students and parents of students

to protect students from hurt, harm or danger. Defendant negligently and grossly negligently

failed to meet those duties in a manner consisting of the following:

      a.     failure to select, perform background checks, hire, train and retain teachers
competent to be trusted with welfare and safety of minor students;

      b.     failure to supervise, manage, train, monitor, or oversee all teachers, including
Campbell, to ensure that teachers are not engaged in inappropriate conduct
during school hours or on school property;

      c.     failure to supervise, manage, monitor or oversee all teachers, including Campbell,
to ensure that they are properly trained with respect to limitations on personal
interactions with students, how to recognize violations of appropriate boundaries,
and to whom and under what circumstances such violations should be reported;

      d.     failure to supervise, manage, monitor or oversee the usage of school property by
teachers, including the usage of cell phones, credit cards, and laptops, to ensure
that teachers are not engaged in inappropriate, pornographic, harassing, or
otherwise inappropriate or illegal usage;

      e.     failure to supervise, manage, monitor or oversee the safety of students on school
property to prevent sexual predation or assault of minor students;

      f.     failure to formulate, adopt, and enforce adequate rules, policies, and procedures
with respect to the appropriate level of contact between teachers and students;

      g.     failure to formulate, adopt, and enforce adequate rules, policies, and procedures
with respect to the appropriate usage of school property by teachers, including
the usage of cell phones, credit cards, and computers, to ensure that teachers are
not engaged in inappropriate, pornographic, harassing, or otherwise inappropriate
or illegal usage;

      h.     failure to formulate, adopt, and enforce adequate rules, policies, and procedures
with respect to the safety of students on school property to prevent sexual
predation or assault of minor students;

      i.     failure to formulate, adopt, and enforce adequate rules, policies, and procedures
with respect to the appropriate methods for responding to the victimization of

students through the implementation of appropriate protocols and programs to address, educate and control the school community to create an appropriate environment, aid in recovery and protect victims from additional trauma;

j.    failure to formulate, adopt, and enforce adequate rules, policies, and procedures with respect to appropriate and inappropriate grounds for dismissal of students from the school;

k.    failure to formulate, adopt, and enforce adequate rules, policies, and procedures to prevent teachers from gossiping with students regarding embarrassing or private information of other students;

l.    failure to have a Quality Assurance program in place to monitor and promote compliance with the above polices and procedures;

m.    failure to prevent the assault of Victim;

n.    failure to prevent the sexual assault of Victim;

o.    negligently forcing the constructive expulsion of Victim; and

p.    failure to appropriately protect Victim following the assault by failing to provide a safe, supportive, and private environment to promote the recovery and well-being of Victim.

39.    As a direct and proximate result of Defendant's acts or omissions as set forth above, it was

foreseeable to a person of ordinary prudence that a student, including Victim, would be exposed

to a danger of injury and be harmed, such that Defendant's acts or omissions are the proximate

cause of Plaintiffs' damages.

C.    Count Three: Negligence Per Se.

40.    Plaintiffs incorporate the above paragraphs by reference.

41. Defendant ESD was responsible for the acts and/or omissions of its agents, ostensible agents, servants, employees and or representatives in causing assault, battery, and sexual assault, as those terms are defined by law, including the following acts or omissions:

    a. intentionally, knowingly, or recklessly causing bodily injury to Victim under TEXAS PENAL CODE § 22.01(a)(1);

    b. intentionally or knowingly causing offensive or provocative physical contact with Victim under TEXAS PENAL CODE § 22.01(a)(3);

    c. intentionally or knowingly causing penetration of the female sexual organ of Victim, a child, by any means under TEXAS PENAL CODE § 22.011(a)(2)(A); and

    d. failure to execercise reasonable care to prevent same.

42. These negligent acts were a proximate cause of damage to Plaintiffs.

D. **Count Four: Negligent Undertaking under** RESTATEMENT (SECOND) OF TORTS § 323.

43. Plaintiffs incorporate the above paragraphs by reference.

44. Defendant undertook, for consideration, to provide educational services and protection for its students, including Victim, pursuant to the RESTATEMENT (SECOND) OF TORTS § 323.

45. Defendant should have recognized as necessary the protection of Victim's person and promulgated or should have promulgated polices and procedures to protect minor students, including Victim, as set forth above.

46. Plaintiffs suffered harm as a result of Defendants' failure to exercise reasonable care in providing its services.

47. Defendant's failure to execercise reasonable care increased the Plaintiffs' risk of harm, or in the alternative, Plaintiffs were harmed in reliance upon Defendant's representation that ESD provided a safe and nurturing environment for its students.

E. Count Five: Breach of Fiduciary Duty.

48. Plaintiffs incorporate the above paragraphs by reference.

49. At all times relevant hereto, ESD owed to Plaintiffs fiduciary duties as result of the long relationship between Plaintiffs and ESD that resulted in a moral, social and personal relationship of trust and confidence, such that Plaintiffs were able to justifiably rely upon the belief that ESD has superior knowledge of the circumstances at the school and would act in their best interests. These duties included the duty of loyalty, candor, and good faith and the duty to act with integrity of the strictest kind.

50. ESD breached this fiduciary duty by acting without the utmost good faith or candor in making material false statements to Father regarding the circumstances at the school and defrauding him into withdrawing Victim after accepting years of tuition fees and representing to Victim and her parents that the school was going to protect her and not hold her at fault. Despite the confidence that Plaintiffs put into the school to act in their best interests, ESD abused this confidence in coercively forcing Father to sign a document withdrawing Victim under false pretenses and for the school's own motives

51. Defendant's breach of fiduciary duty was a proximate cause of the damages to Plaintiffs and for which Plaintiffs seek actual damages, including disgorgement of past monies paid.

F.      Count Six: Fraud.

52.     Plaintiffs incorporate the above paragraphs by reference.

53.     Defendant represented to Plaintiffs that ESD was a parochial school, founded upon

Episcopalian principles, that would keep safe and nurture students in a religious environment.

Based on these representations, Plaintiffs enrolled and entrusted Victim to Defendant's

safekeeping and control, believing that the school would act consistently with its stated goals

and Episcopalian principles. Defendant's representation was made with the intent to have

prospective parents enroll their children, as Plaintiffs did, but was either knowingly false or

recklessly false because Defendants did not perform the necessary tasks to fulfill those

representations, including as follows:

      a.     failure to select, perform background checks, hire and retain teachers competent
               to be trusted with welfare and safety of minor students;

      b.     failure to supervise, manage, monitor, or oversee all teachers, including
               Campbell, to ensure that teachers are not engaged in inappropriate conduct
               during school hours or on school property;

      c.     failure to supervise, manage, monitor or oversee all teachers, including Campbell,
               to ensure that they are properly trained with respect to limitations on personal
               interactions with students;

      d.     failure to supervise, manage, monitor or oversee the usage of school property by
               teachers, including the usage of cell phones and computers, to ensure that
               teachers are not engaged in inappropriate, pornographic, harassing, or otherwise
               inappropriate or illegal usage;

      e.     failure to supervise, manage, monitor or oversee the safety of students on school
               property to prevent sexual predation or assault of minor students;

      f.     failure to formulate, adopt, and enforce adequate rules, policies, and procedures
               with respect to the appropriate level of contact between teachers and students;

g.    failure to formulate, adopt, and enforce adequate rules, policies, and procedures
      with respect to the appropriate usage of school property by teachers, including
      the usage of cell phones and computers, to ensure that teachers are not engaged
      in inappropriate, pornographic, harassing, or otherwise inappropriate or illegal
      usage;

h.    failure to formulate, adopt, and enforce adequate rules, policies, and procedures
      with respect to the safety of students on school property to prevent sexual
      predation or assault of minor students;

I.    failure to formulate, adopt, and enforce adequate rules, policies, and procedures
      with respect to the appropriate method of treating victimized students to aid their
      recovery and protect them from additional trauma;

j.    failure to formulate, adopt, and enforce adequate rules, policies, and procedures
      with respect to appropriate and inappropriate grounds for dismissal of students
      from the school;

k.    failure to formulate, adopt, and enforce adequate rules, policies, and procedures
      to prevent teachers from gossiping with students regarding embarrassing or
      private information of other students;

l.    failure to have a Quality Assurance program in place to monitor and promote
      compliance with the above polices and procedures;

m.    failure to prevent the assault of Victim;

n.    failure to prevent the sexual assault of Victim;

o.    constructive expulsion of Victim; and

p.    failure to appropriately protect Victim following the assaults by failing to provide
      a safe, supportive, and private environment to promote the recovery and well-
      being of Victim.

54.    Defendant additionally committed fraud by making materially false statements, that ESD

knew to be false, in an effort to induce Father to withdraw victim. Royall and Mayo gave Father

false information about the state of knowledge at the school and the ramifications of what would

happen to Victim if Father did not withdraw her, and Father relied upon those false statements in so withdrawing Victim.

55. As a result of Defendant's fraudulent representations, Plaintiffs were exposed to and were harmed when Victim was assaulted as set forth above and then forced out of the school. Plaintiffs' damages are a proximate result of their reliance on Defendants' fraudulent representations.

G. Count Eight: Defamation, Publicity of Embarrassing Facts, and False Light.

56. Plaintiffs incorporate the above paragraphs by reference.

57. Once ESD forced Victim out of the school, Victim was defamed and cast publicly in a false light, as ESD created the public impression that Victim was at fault and to blame for the incident. Through the creation of this public impression, Victim's reputation was materially harmed, she was defamed, and she was cast in a false light that negatively effected her standing and reputation in the community and caused embarrassment, shame, and isolation for Victim. Moreover, prior to the termination and afterwards, ESD's employees, before and after the expulsion, gossiped about Victim and made slanderous comments and innuendo about Victim's virtue and imputed sexual misconduct on her.

58. Defendant's conduct in that regard is a proximate cause of Plaintiffs' damages.

H. Count Nine: Securing Execution of a Document by Deception in Violation of Texas Penal Code § 32.46.

59. Plaintiffs incorporate the above paragraphs by reference.

60.    ESD knowing and intentionally misrepresented facts to the Parents with the intent to

defraud and induce them to execute the withdrawal papers and remove Victim. ESD knowingly

made false statements to Father regarding the circumstances surrounding Victim at school, the

knowledge of the community about the circumstances, and what would result if Father did not

sign the withdrawal papers with the intent to induce Father to sign papers withdrawing Victim.

Relying upon ESD's false statements, Father executed the written instrument that adversely

affected the property and interests of Victim and her family.

61.    Defendant's conduct in that regard is a proximate cause of Plaintiffs' damages.

I.     Count Ten:    Gross Negligence.

62.    Plaintiffs incorporate the above paragraphs by reference.

63.    Plaintiffs aver that the specific conduct listed above, complained of in the above counts,

and displayed by Defendants was substantially more than ordinary carelessness, inadvertence,

or laxity, but rather specifically consisted of gross negligence and malice, as those terms are

defined by law, and were done with either specific intent or with conscious indifference and

in reckless disregard for the rights, safety, and well-being of Victim.

64.    For this gross negligence, Plaintiffs specifically plead for the recovery of exemplary

damages as set forth herein.

## VII.
## DAMAGES

65.    As a direct and proximate result of the negligent acts and/or omissions of Defendant as

set out above, Victim has suffered, and in all probability will, for the remainder of her life,

continue to suffer past and future (1) mental anguish; (2) medical treatment; (3) pain and suffering; (4) and loss of enjoyment of life; and (5) injury to character and reputation. All of the above have resulted in damages which are within the jurisdictional limits of this Court, for which Plaintiffs now plead, jointly and severally, against Defendant.

66.     As a direct and proximate result of the negligent acts and/or omissions of the Defendant as set out above, Father and Mother have suffered, and in all probability will, for the remainder of their lives, continue to suffer past and future (1) mental anguish and (2) loss of consortium. Additionally, Father and Mother plead for disgorgement of monies paid to ESD for all past tuition paid.

67.     Plaintiffs would show further that each and every negligent act and/or omission of Defendant and their agents, as set forth in detail above, when viewed objectively from the standpoint of the act or at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the physical harm to others in that Defendant had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of Victim and other students of ESD, and as such, such conduct amounts to gross negligence and/or malice, as those terms are defined by law, so as to give rise to an award of exemplary or punitive damages. Additionally, Plaintiffs' claims for fraud support an award of exemplary damages.

68.     The actions of ESD employee and its agent, J. Nathan Campbell, were done with the specific intent to cause substantial injury or harm to Victim. As such, those actions give rise to an award of exemplary or punitive damages. Further, there is no limitation or cap on the

recovery of exemplary or punitive damages against Defendants as TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.008(c) does not apply to a cause against a defendant from whom a plaintiff seeks recovery of exemplary damages based on conduct described as a felony in § 22.011 of the TEXAS PENAL CODE. Under TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.005, employers are liable for exemplary damages for the criminal acts of their employees. ESD is further liable for punitive damages, as J. Nathan Campbell was an unfit employee and ESD was reckless in employing and continuing to employ him.

69.     Moreover, ESD's action with intent to secure the execution of withdrawal papers by Father by fraud in violation of Section 32.46 of the TEXAS PENAL CODE, thereby abrogates any caps on exemplary damages pursuant to Section 41.008(c)(11) of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

70.     The negligent acts and/or omissions of Defendant, as set forth above, demonstrate such an entire want of care as to indicate that the acts and/or omissions were the result of actual conscious indifference to the rights, safety, and welfare of Victim and constitute gross negligence and/or malice, as those terms are defined by the laws of the State of Texas, and require an award of exemplary damages against the Defendant. By reason of such conduct, Plaintiffs are entitled to and therefore assert a claim for punitive and exemplary damages in an amount sufficient to punish and deter Defendants, and others like them, from such conduct in the future.

## VIII.
## COUNTER-DEFENSES

71.    Plaintiffs assert that any attempt to ESD to avail itself of any protection of the Charitable

Immunity Act in TEXAS CIVIL PRACTICE & REMEDIES CODE § 84.007 is barred because ESD's

conduct include acts or omissions that were intentional, wilfully negligent, or done with

conscious indifference or reckless disregard for the safety of others. Moreover, ESD did not

comply with the terms of the act by failing to have the required insurance in place to cover the

acts of its employees.

72.    Moreover, ESD must be equitably barred from asserting the protections of those acts by

the doctrine of estoppel. At no time has ESD complied with the requirements of a charitable

institution under Internal Revenue Code § 501(c)(3), and therefore they must be barred from

no invoking the protections of such a statute.

## IX.
## REQUEST FOR A JURY TRIAL

73.    Plaintiffs demand a jury trial on all issues so triable.

## X.
## PRAYER

74.    Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final

determination of these causes of action, Plaintiffs receive a judgment against Defendants, jointly

and severally, awarding the Plaintiffs as follows:

   a.    Actual, compensatory, consequential, exemplary, and punitive damages, in an
         amount in excess of the minimal limits of the Court against the named
         Defendants;

b.  Reasonable and necessary attorneys' fees;

c.  Costs of Court;

d.  Prejudgment interest at the highest rate allowed by law from the earliest time
    allowed by law;

e.  Interest on judgment at the highest legal rate from the date of judgment until
    collected; and

f.  All such other and further relief at law and in equity to which the Plaintiffs may
    show themselves to be justly entitled.

Respectfully submitted,

CHARLA G. ALDOUS
State Bar. No. 20545235
BRENT R. WALKER
State Bar No. 24047053
ALDOUS LAW FIRM
2311 Cedar Springs Rd., Suite 200
Dallas, TX 75201
Phone: (214) 526-5595
Fax:    (214) 526-5525

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served upon the

following counsel of record in the manner set forth below on this 25th day of April, 2011:

Chrysta Casteneda
LOCKE LORD BISSELL & LIDDELL
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

☐ First Class Mail, postage prepaid
☐ Certified Mail, Return Receipt Requested
☒ Telecopier
☐ Hand Delivery / Federal Express

BRENT R. WALKER